**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VIVIAN M. RODRIGUEZ,**

                                    **Plaintiff,**                    **6:14-cv-1129**
                                                                      **(GLS)**

                    **v.**

**CAROLYN W. COLVIN,** Acting
Commissioner of Social Security,

                                    **Defendant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Peter M. Hobaica, LLC          B. BROOKS BENSON, ESQ.
2045 Genesee Street
Utica, NY 13501

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN          DAVID L. BROWN
United States Attorney                   Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Vivian M. Rodriguez challenges the Commissioner of Social Security's denial of Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Compl., Dkt. No. 1.)  After reviewing the administrative record and carefully considering Rodriguez's arguments, the court affirms the Commissioner's decision and dismisses the complaint.

## II. Background

On November 20, 2001, an Administrative Law Judge (ALJ) found that Rodriguez became disabled on July 8, 1998 due to, among other things, back and shoulder pain, anxiety, and depression, and awarded DIB and SSI benefits.  (Tr.[1] at 32, 119, 124, 141.)  Subsequently, in September 2007, the Commissioner reviewed Rodriguez's claim and determined that her disability continued.  (*Id.*)  On May 27, 2011, Rodriguez was informed that the Commissioner had again reviewed her claim, but this time it was determined that she was no longer disabled.  (*Id.* at 117-24.)  This determination was affirmed after a disability hearing by a State Agency

---

[1] Page references preceded by "Tr." are to the Administrative Transcript.  (Dkt. No. 9.)

Disability Hearing Officer. (*Id.* at 139-49.) At Rodriguez's request, a hearing before ALJ Bruce Fein (hereinafter "the ALJ") was subsequently conducted. (*Id.* at 82-110.) On January 29, 2013, the ALJ issued an unfavorable decision, finding that Rodriguez's disability had ceased on May 27, 2011. (*Id.* at 29-50.) This decision became the Commissioner's final determination upon the Appeals Council's denial of review. (*Id.* at 1-6.)

Rodriguez commenced the present action by filing her complaint on September 15, 2014 wherein she sought review of the Commissioner's determination. (Compl.) The Commissioner filed an answer and a certified copy of the administrative transcript. (Dkt. Nos. 8, 9.) Each party, seeking judgment on the pleadings, filed a brief. (Dkt. Nos. 14, 18.)

### III. **Contentions**

Rodriguez contends that the Commissioner's decision is tainted by legal error and is not supported by substantial evidence. (Dkt. No. 14 at 8-20.) Specifically, Rodriguez claims that the ALJ erred when he: (1) concluded that she experienced medical improvement in her neck and shoulder impairment; (2) failed to find several of her impairments severe under the regulations; (3) failed to obtain a functional assessment from any of her treating physicians; (4) rendered a residual functional capacity

3

(RFC) determination that was not sufficiently specific and without the support of a medical opinion; (5) evaluated her credibility; and (6) determined that there is work in the national economy that she can perform, without the aid of a vocational expert (VE). (*Id.*) The Commissioner counters that the appropriate legal standards were used by the ALJ and his decision is also supported by substantial evidence. (Dkt. No. 18 at 7-21.)

## IV.  Facts

The court adopts the undisputed factual recitations of the parties and the ALJ.  (Dkt. No. 14 at 1-8; Dkt. No. 18 at 1; Tr. at 34-44.)

## V.  Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[2] is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).  If the Commissioner finds that an individual is no longer disabled, as in this case, her benefits

---

[2] 42 U.S.C. § 1383(c)(3) renders section 405(g) applicable to judicial review of SSI claims.  As review under both sections is identical, parallel citations to the regulations governing SSI are omitted.

may be terminated.  *See* 42 U.S.C. §§ 423(f)(1), 1382c(a)(4).  Such a

termination requires, as relevant here, substantial evidence[3] demonstrating

a "medical improvement" which enables the individual to engage in

"substantial gainful activity."  *Id.*  If medical improvement is found to be

related to an individual's ability to work, then the ALJ is required to carry

out the sequential evaluation process that is used in an initial

determination.  *See* 20 C.F.R. § 404.1594(f)(1)-(8).  If the claimant's

impairments are severe, but do not meet or equal the severity of any

impairment contained in the Listing of Impairments, the individual's current

RFC must be assessed based on all current impairments.  *See id.*

§ 404.1594(f)(6)-(8).  As in an initial determination, the individual's current

RFC will be compared to her past relevant work in order to determine if she

can perform such work.  *See id.* § 404.1594(f)(7).  If the RFC, age,

education and work experience do not permit an individual to perform past

relevant work, a determination will be made as to whether there is other

work in the national economy that she can do.  *See id.* § 404.1594(f)(8).  If

such work exists, the claimant's disability will have ended.  *See id.*

---

[3] "Substantial evidence is defined as more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal quotation marks and citations omitted).

## VI.  Discussion

**A.    Medical Improvement**

Rodriguez first contends that the ALJ erred in finding that there was medical improvement in her neck and shoulder conditions since the date of her most recent favorable medical decision that found that she continued to be disabled, referred to as the "comparison point decision" (CPD).[4]  (Dkt. No. 14 at 8-10.)  The Commissioner, on the other hand, argues that Rodriguez's treatment records, consultative examinations, and daily activities since the CPD support the ALJ's determination that Rodriguez's impairments had improved.  (Dkt. No. 18 at 7-11.)  The court agrees with the Commissioner.

As noted above, termination of disability benefits can occur "if there is substantial evidence demonstrating a 'medical improvement' which enables the individual to engage in substantial gainful activity."  *Matice v. Comm'r of Soc. Sec.*, No. 6:99-CV-1834, 2004 WL 437472, at *3 (N.D.N.Y. Feb. 11, 2004) (quoting 42 U.S.C. § 1382c(a)(4)).  "Medical improvement" means "any decrease in the medical severity of [the claimant's]

_____

[4]  Here, the CPD is the September 2007 determination that Rodriguez continued to be disabled.  (Tr. at 119, 124.)

impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.*

Here, at the time of the CPD, Rodriguez was found disabled because her back and shoulder pain, anxiety, and depression resulted in the ability to perform only less than sedentary work. (Tr. at 34, 119, 124.) At that time, she had "low back and leg pain with trouble sitting or standing for long periods[,] trouble concentrating [and] thoughts of suicide and death." (*Id.* at 141.) Also, Rodriguez had "difficulty with sleeping, large crowds, loud noises, closed places, loss of appetite, and severe depression." (*Id.*) The ALJ based his determination that there had been medical improvement on Rodriguez's lack of recent treatment for back pain, sporadic mental health treatment, benign mental status examinations, as well as the lack of current evidence of a positive impingement sign in Rodriguez's shoulders. (*Id.* at 39; *see, e.g.*, *id.* at 321, 397, 399, 402, 444, 618-19, 646.) Rodriguez does not dispute the veracity of these facts, but,

instead, argues that her treatment notes from 2012 indicate that she experienced ongoing neck and shoulder pain. (Dkt. No. 14 at 3-4, 8-9.) Because the record supports the ALJ's conclusion that the "symptoms, signs and/or laboratory findings" associated with Rodriguez's back and mental health impairments had decreased since the CPD, his decision that there had been a medical improvement is supported by substantial evidence. *See* 20 C.F.R. § 404.1594(b)(1).

Turning to her neck and shoulder impairment, Rodriguez was examined by consultative examiner Kaylani Ganesh in May 2011. (Tr. at 402-10.) Rodriguez reported to Dr. Ganesh that she was not receiving any treatment, had not seen her primary care physician in a while, and was taking over-the-counter medications. (*Id.* at 402.) Dr. Ganesh's examination revealed full range of motion in Rodriguez's cervical spine. (*Id.* at 404.) Shoulder forward elevation and abduction was limited to 100 degrees, but adduction and internal and external rotation were normal. (*Id.*) Rodriguez had 4/5 strength in her upper extremities, 5/5 grip strength bilaterally, and intact hand and finger dexterity. (*Id.*) At that time, an x-ray of Rodriguez's cervical spine revealed degenerative changes, and a shoulder x-ray revealed merely that she was status post surgery. (*Id.* at

406, 410.)  Based on the foregoing, Dr. Ganesh opined that Rodriguez had no limitations in her ability to sit, stand, or walk, and was only moderately limited in her ability to lift, carry, push, pull, and complete overhead activities.  (*Id.* at 405.)  After reviewing Dr. Ganesh's examination results as well as Rodriguez's treatment records, on May 25, 2011, medical consultant J. Dale opined that Rodriguez was capable of light exertion, including lifting and carrying twenty pounds occasionally and ten pounds frequently, with restrictions on repetitive overhead use of her bilateral upper extremities.  (*Id.* at 425-30.)  Thereafter, in September 2011, medical consultant H. Findlay noted that Rodriguez had not received any treatment since being notified that the Commissioner had determined her disability ceased, and concurred with Dr. Dale's functional assessment.  (*Id.* at 298-303.)

The foregoing examination results and medical opinions clearly support the ALJ's decision that, since May 27, 2011, Rodriguez was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently, continuously handling, fingering, and feeling with her upper extremities, and continuously reaching in front of her, but could only occasionally reach overhead with her upper extremities.  (Tr. at 39-40.)

Nevertheless, Rodriguez argues that it was error for the ALJ to rely on such evidence because treatment records from 2012, after Dr. Ganesh's examination took place and the foregoing medical opinions were rendered, "demonstrate an objective basis . . . for [Rodriguez]'s complaints of pain, numbness and tingling[,] and functional difficulties in the neck, arms and hands." (Dkt. No. 14 at 9.) According to Rodriguez, she failed to receive treatment for her neck and shoulder impairments in 2011 because she was addressing her cardiac problems, and "once those were addressed, she was in a position to begin treatment again in 2012." (*Id.*)

Despite Rodriguez's contention, considering all of the medical evidence of record, the ALJ's decision that she was able to perform light work[5] despite her cervical and shoulder impairments is supported by substantial evidence. Notably, in April 2012, treating physician Adnan Cemer's examination of Rodriguez was benign with no pain or tenderness in her neck, and full range of motion in her left arm with no instability, atrophy, or weakness. (Tr. at 470-72.) Rodriguez reported to Dr. Cemer

_____

[5] Light work requires lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds. *See* 20 C.F.R. § 404.1567(b). Further, "the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday." SSR 83-10, 1983 WL 31251, at *6 (1983).

that physical therapy had helped her shoulder pain, and she "occasionally" took an over the counter pain reliever to deal with the continuing pain.  (*Id.* at 470.)  Subsequently, in May 2012, Rodriguez complained to treating physician Michael McNulty of cervical pain that radiated to her shoulders and arms, but she denied any weakness or tingling in her arms.  (*Id.* at 499.)  On examination, there was tenderness in her neck and her range of motion was decreased by ten percent.  (*Id.* at 500.)  She had moderate tenderness in her left rotator cuff and abduction was decreased twenty degrees.  (*Id.*)  However, flexion and external rotation of her shoulder were within normal limits, and she had 5/5 strength in her shoulders, elbows, wrists, and fingers grip.  (*Id.*)  Although these clinical findings provide some support for Rodriguez's subjective complaints of pain, Rodriguez reported to Dr. McNulty that she was independent in her activities of daily living and could comfortably lift ten pounds, but had difficulty doing tasks that required her to lift her left arm above her head.  (*Id.* at 499.)  These statements support the ALJ's RFC determination, which accounted for Rodriguez's reduced ability to reach overhead.  (*Id.* at 40.)

In September 2012, Rodriguez again complained to Dr. McNulty of neck pain that radiated into her shoulders.  (*Id.* at 571.)  Rodriguez

reported that her current medications provided only mild relief of her symptoms, but, in the past, physical therapy had provided moderate relief. (*Id.*) Dr. McNulty's examination revealed tenderness in her cervical spine and a "mildly reduced" range of motion. (*Id.* at 572.) Rodriguez again had full strength in her shoulders, elbows, wrists, and fingers grip, however sensory testing was reduced. (*Id.*) Dr. McNulty reviewed an MRI taken in August 2012, which revealed multilevel degenerative changes with central canal and neural foraminal narrowing, but no cord impingement. (*Id.* at 572, 618-19.) In addition, an electromyography and nerve conduction velocity test revealed no evidence of peripheral neuropathy of her median or ulnar nerves, but possible C7 denervation not correlated with paraspinal activity. (*Id.* at 573, 584.) Again, while these findings offer some support for Rodriguez's contention that her neck and shoulder impairments caused pain as well as limitations in her ability to function, they do not compel the conclusion that she could not perform light work. Importantly, "whether there is substantial evidence supporting the appellant's view is not the question," instead, the court must "decide whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d. Cir. 2013). Here, it is clear from the ALJ's decision that he

considered all of the examination results, medical opinions, and Rodriguez's own statements with respect to her shoulders and neck, (Tr. at 35, 41-43), and his determination that Rodriguez's neck and shoulder impairments no longer prevented her from performing light work is supported by substantial evidence.

Because the ALJ's RFC determination, discussed further below, is supported by substantial evidence, the ALJ did not err in concluding that Rodriguez's medical improvement is related to her ability to do work. *See* 20 C.F.R. § 404.1594(b)(3) (declaring that medical improvement is related to a claimant's ability to work if there has been a decrease in the severity of the impairments present at the time of the most recent favorable medical decision and an increase in the claimant's functional capacity); *infra* Part VI.D.

## B.  Severity Determination

Next, Rodriguez contends that remand is required here because the ALJ failed to find her coronary artery disease, depressive disorder, breathing difficulties, and "abdominal complaints" severe under the regulations.  (Dkt. No. 14 at 16-20.)  The Commissioner counters, and the court agrees, that the ALJ's severity determination was legally sufficient

and supported by substantial evidence, and, at most, any error was harmless, as the ALJ considered all of Rodriguez's impairments, severe and nonsevere, in determining her RFC. (Dkt. No. 18 at 17-22.)

After finding that medical improvement related to the claimant's ability to do work has been shown, an ALJ must determine whether all the claimant's "current impairments in combination are severe." 20 C.F.R. § 404.1594(f)(6). A finding of not severe is appropriate when an impairment, or combination of those impairments, "does not significantly limit [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1521(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including: "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," as well as "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." *Id.* § 404.1521(b). "The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." *Bergeron v. Astrue*, No. 09-CV-

1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011) (quoting *McConnell v. Astrue*, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). The failure to find an impairment severe may be deemed harmless error, particularly where the disability analysis continues and the ALJ later considers the impairment in his RFC determination. *See Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012); *see also Plante v. Astrue*, No. 2:11-CV-77, 2011 WL 6180049, at *4 (D. Vt. Dec. 13, 2011).

In this case, the ALJ determined that, among other things, Rodriguez's degenerative disc disease of the cervical spine was a severe impairment. (Tr. at 34.) On the other hand, he concluded that her depressive disorder, atypical chest pain, respiratory impairments, and diverticulitis were not severe. (*Id.* at 34-35.) Because the ALJ found that Rodriguez suffered from at least one severe impairment, he continued the sequential evaluation, and assessed her current RFC. (*Id.* at 40-43.) In making his RFC determination, the ALJ specifically considered Rodriguez's chest pain, mental impairments, breathing difficulties, and abdominal pain. (*Id.*) For the reasons that follow, the ALJ's determination with respect to the severity of these impairments and the functional limitations they caused

15

is supported by substantial evidence.  Moreover, because the ALJ considered these impairments in making his RFC determination, any legal error made in determining their severity is harmless.  *See Tryon*, 2012 WL 398952, at *4 (explaining that the failure to find an impairment severe may be deemed harmless error, particularly where the disability analysis continues and the ALJ later considers the impairment in his RFC determination).

Rodriguez complains that the ALJ failed to specifically consider, when discussing the severity of her chest pain, the twenty-nine percent left ventricular ejection fraction and the more than fifty percent blockage of one of her arteries noted in her treatment records, which findings meet some of the criteria for listing 4.02, pertaining to chronic heart failure, and 4.04 pertaining to ischemic heart disease.  (Dkt. No. 14 at 16-17.)  Rodriguez asserts that, even though the evidence may not show that she meets all the requirements for these listings, the fact that she meets certain criteria evinces the need for the ALJ to have sought the opinion of a cardiologist to determine the functional limitations caused by her coronary artery disease. (*Id.* at 17.)

Rodriguez's argument is meritless.  The ALJ clearly explained his

reasons for finding her chest pain to be a nonsevere impairment, and his reasoning is supported by substantial evidence. (Tr. at 36.) Specifically, in August 2011, Rodriguez was treated in the emergency room with complaints of chest pain, (*id.* at 243-48), and hospitalized overnight for what was diagnosed as atypical chest pain. (*Id.* at 264-65, 267.) At that time, a chest x-ray revealed no acute cardiopulmonary disease, an echocardiogram revealed preserved left ventricular function with an ejection fraction estimated at sixty percent, and normal valvular function, and a nuclear stress test revealed apical ischemia and left ventricular ejection fraction of twenty-nine percent. (*Id.* at 271-73, 276.) Thereafter, Rodriguez began treatment with cardiologist Matthew Thomas, whose examinations revealed no clinical findings. (*Id.* at 487, 493, 498.) Dr. Thomas ordered a cardiac catheritization, the results of which were "negative," revealing angiographically functionally insignificant coronary artery disease, normal left ventricular function with an ejection fraction estimated at sixty percent, and normal resting hemodynamics. (*Id.* at 289-90, 487.) By November 2011, Dr. Thomas noted that Rodriguez's chest pain had been resolved with medication, recommended she quit smoking, and concluded that her next follow up appointment need not occur for a

year and a half. (*Id.* at 487.) There are no further cardiology treatment notes of record.

Based on the foregoing, the ALJ's conclusion that Rodriguez's chest pain was nonsevere is supported by substantial evidence, and the failure to discuss certain specific clinical findings does not require remand. *See Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (explaining that it is not necessary that the ALJ "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability" (internal quotation marks and citation omitted)). In making his RFC determination, the ALJ considered Rodriguez's complaints of chest pain, but noted that they were transient and, thus, concluded that they did not cause any functional limitations. (*Id.* at 41.) This too, is supported by the foregoing substantial evidence. Moreover, as discussed below, *see infra* Part VI.C, because there were no "obvious gaps" in the record with respect to Rodriguez's chest pain, the ALJ was not obligated to seek additional information from her treatment providers. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

Next, Rodriguez complains that the ALJ erred in failing to find her

depressive disorder severe.  (Dkt. No. 14 at 17-19.)  According to

Rodriguez, the ALJ should have further developed the record regarding her

post-traumatic stress disorder (PTSD) symptoms and obtained a medical

source statement form her treating psychiatrist.  (*Id.*)  Instead, Rodriguez

argues, the ALJ improperly relied on the opinion of consultative examiner

Jeanne Shapiro.  (*Id.*)  Again, the court finds Rodriguez's arguments

meritless, and concludes that the ALJ properly considered Rodriguez's

mental impairments in making his severity determination.  (Tr. at 37-38.)

After concluding that Rodriguez suffers a medically determinable

mental impairment, (*id.* at 34, 37), the ALJ evaluated Rodriguez's mental

impairments in the four broad categories of functioning and determined

that she suffered no limitations in activities of daily living; mild limitations in

social functioning; mild difficulties in concentration, persistence, or pace;

and had experienced no episodes of decompensation, (*id.* at 38).  *See* 20

C.F.R. § 404.1520a(c)(3)*.*  These conclusions were supported by the

medical source statement of Dr. Shapiro as well as medical consultants T.

Andrews and C. Butensky, who reviewed the medical evidence of record in

May and September 2011, respectively.  (*Id.* at 314, 316, 397-401, 421,

423); *see Baszto v. Astrue,* 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010)

("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability."). Further, the ALJ noted that Rodriguez had received no mental health treatment from 2007 until April 2012, and on her most recent examination of record, in November 2011, it was noted that she was "doing better[,] [h]er mood ha[d] improved.  She sle[pt] better.  She [was] not as irritable. She [was] more open and cooperative.  She d[id] not have the short temper she used to . . . .  She admit[ed] to noticing a change in herself. Atvian [was] helping and she only use[d] it as needed."  (*Id.* at 37, 645.) Upon examination her affect was appropriate, mood euthymic, thought process intact and logical, memory intact, insight and judgment fair, and impulse control good.  (*Id.* at 645-46.)

Because the ALJ had before him all of Rodriguez's mental health treatment records, as well as medical opinions detailing the functional limitations caused by such impairments, he was under no duty to seek a medical source statement from a treating mental health provider before making his determination.  *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013).  The foregoing evidence clearly supports the ALJ's severity

determination with respect to Rodriguez's mental health.  Further, when making his RFC determination, the ALJ conducted a function-by-function assessment of Rodriguez's ability to perform the mental demands of work, which assessment was also supported by such evidence.  (*Id.* at 40.)

Rodriguez also claims that the ALJ erred in failing to discuss whether her "breathing difficulties" constituted a severe impairment.  (Dkt. No. 14 at 19.)  On the contrary, the ALJ discussed such problems, noting that she denied a history of chronic obstructive pulmonary disorder or asthma to Dr. Ganesh, and, moreover, pulmonary function tests performed in May 2011 were normal.  (Tr. at 35, 402, 404.)  Additionally, in his RFC determination, the ALJ concluded that Rodriguez must avoid concentrated exposure to respiratory irritants.  (*Id.* at 40.)  Thus, not only did the ALJ discuss the severity of Rodriguez's breathing difficulties, he considered this nonsevere impairment in reaching his RFC determination.

Finally, Rodriguez argues that the ALJ erred in finding her abdominal complaints to be nonsevere without requesting a functional assessment from her treating physician.  (Dkt. No. 14 at 19-20.)  According to Rodriguez, the ALJ's conclusion that her abdominal problems were not long-lasting enough to be severe under the regulations was speculative

and unsupported by her treatment records.  (*Id.*)  Despite Rodriguez's objections, the ALJ's conclusion that her abdominal problems do not significantly limit her ability to do basic work activities, and are, thus, nonsevere, is supported by substantial evidence.  (Tr. at 35-36.)  In determining her RFC, the ALJ considered Rodriguez's complaints of abdominal pain, noted that they were transient, and concluded that they did not cause any functional limitations.  (*Id.* at 41.)  This too is supported by substantial evidence.

In particular, as the ALJ pointed out, although Rodriguez reported a history of diverticulitis to her treating physician in February 2012, her treatment notes since May 2011 indicate only a diagnosis of diverticulosis.[6] (*Id.* at 35, 364-66, 467.)  Indeed, Rodriguez's treatment records, including a colonoscopy and a CT scan, (*id.* at 511, 605), indicate no evidence of diverticulitis.[7]  In May 2012, Rodriguez reported "some crampy abdominal

---

[6] Diverticulosis, a common condition found in about half of all people over the age of sixty, occurs when small, bulging pouches, called diverticula, develop in the digestive tract. *See* Nat'l Inst. of Diabetes and Digestive and Kidney Diseases, Diverticulosis and Diverticulitis, https://www.nlm.nih.gov/medlineplus/diverticulosisanddiverticulitis.html (last visited Jan. 28, 2016).  This condition is often unaccompanied by any symptoms, although it sometimes causes mild cramps, bloating or constipation.  *Id.*

[7] Diverticulitis occurs when diverticula become inflamed or infected, commonly causing abdominal pain.  *See* Nat'l Inst. of Diabetes and Digestive and Kidney Diseases, Diverticulosis and Diverticulitis, https://www.nlm.nih.gov/medlineplus/diverticulosisanddiverticulitis.html (last visited Jan. 28, 2016).

pain" prior to bowel movements which was relieved after defecation. (Tr. at 620.) Her treating gastrologist noted that her abdominal pain, diarrhea, and dysphagia had improved, advised she take Omeprazole to treat her reflux symptoms and eat a high fiber diet, and discharged her for follow up as needed. (*Id.* at 622.) In September 2012, she complained of "some abdominal bloating and cramps." (*Id.* at 574.) Rodriguez's physical examination at this time was benign, she was prescribed Prilosec, and a lactose tolerance test was ordered. (*Id.* at 574-76.) Overall, the ALJ's characterization of Rodriguez's complaints of abdominal pain as transient is supported by the record and, thus, his determination will not be disturbed. (*Id.* at 41.)

## C. Development of the Record

Next, Rodriguez argues that the ALJ failed to obtain a functional assessment of her abilities from any treating physician, as required under the regulations. (Dkt. No. 14 at 10-11.) Rodriguez contends that, because she appeared *pro se* at the administrative hearing, the ALJ was under a heightened duty to develop a complete medical history. (*Id.*) The court disagrees.

Although the ALJ has an affirmative obligation to develop the

administrative record, and, in fact, a "heightened duty" to develop the record when a claimant proceeds *pro se*, *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks and citations omitted), this duty is not without limit, *see Guile v. Barnhart*, No. 5:07-cv-259, 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010); *see also* 20 C.F.R. § 404.1512(d) (stating that generally, a complete record contains a "medical history for at least the [twelve] months preceding the month in which" the claimant files her application). Indeed, if all of the evidence received is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and the ALJ may make his determination based upon that evidence. *See* 20 C.F.R. § 404.1520b(a). Consistent with that notion, where there are no "obvious gaps" in the record, the ALJ is not required to seek additional information. *Rosa*, 168 F.3d at 79 n.5.

As noted above, *see supra* Part VI.B, here, the record was sufficiently robust for the ALJ to make a disability determination. In particular, the ALJ had Rodriguez's treatment records dating back to 1996. (*See generally* Tr. at 321-42, 357-96, 443-65, 466-550, 558-622, 623-88.) In addition, the ALJ had mental and physical functional assessments from

24

both examining and non-examining physicians, which he used to determine Rodriguez's RFC. (*Id.* at 298-317, 343-44, 397-430.) Given these circumstances, the ALJ did not have "any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians." *Pellam*, 508 F. App'x at 90 n.2 (explaining that the lack of a treating source statement will not, by itself, necessarily render the record incomplete).

## D.   RFC Determination

Rodriguez also argues that the ALJ's RFC determination is infirm. (Dkt. No. 14 at 12-13, 15-16.) In particular, Rodriguez alleges that the RFC determination is not sufficiently specific and based on the ALJ's own opinion, as opposed to that of a competent medical professional. (*Id.*) Again, the court disagrees.

A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see also id.* § 404.1594(b)(4). In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain. *Id.* § 404.1545(a)(3). An ALJ's RFC determination must be supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g).

If it is, that determination is conclusive and must be affirmed upon judicial review.  *See id.*; *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, the ALJ determined that, as of May 27, 2011, Rodriguez retained the ability to lift and carry twenty pounds occasionally and ten pounds frequently, sit for six hours and walk or stand for six hours in an eight-hour work day, occasionally engage in postural activities, continuously handle, finger, feel, and reach in front of her with her upper extremities, and perform the mental demands of unskilled work.[8]  (Tr. at 40.)  Further, the ALJ concluded that Rodriguez could only occasionally reach overhead with her upper extremities, and should avoid concentrated exposure to respiratory irritants.  (*Id.*)  Thus, Rodriguez's assertion that the ALJ failed to specify the functions she could perform, (Dkt. No. 14 at 12-13), is plainly untrue.

In making his RFC decision, the ALJ relied on the medical opinions of Drs. Shapiro and Ganesh.  (Tr. at 43.)  Rodriguez argues that Dr.

---

[8] The ALJ provided an explicit function-by-function analysis of Rodriguez's mental abilities, and those abilities meet the requirements for unskilled work.  (Tr. at 40); *see* SSR 96–9p, 61 Fed. Reg. 34,478, 34,483 (July 2, 1996) (explaining that the mental activities generally required by competitive, remunerative, unskilled work are: understanding, remembering, and carrying out simple instructions; making simple work-related decisions, responding appropriately to supervision co-workers and usual work situations, and dealing with changes in a routine work setting).

Ganesh's opinion was too vague for the ALJ to rely on in rendering his RFC decision because she did not specify the number of hours which she believed Rodriguez could stand and walk in a work day, or state that Rodriguez could occasionally stoop.  (Dkt. No. 14 at 15.)  However, Dr. Ganesh's opinion clearly states that Rodriguez suffers no limitations in her ability to sit, stand, or walk.  (Tr. at 405.)  In Dr. Ganesh's opinion, the only limitations that Rodriguez suffers pertain to her ability to use her upper extremities.  (*Id.*)  This opinion was clearly not so vague as to prevent the ALJ to bridge the gap between Rodriguez's impairments and the functional limitations for walking or stooping.  S*ee Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superceded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2); *see also Kinder v. Colvin*, No. 13-CV-06368, 2014 WL 4184820, at *7 (W.D.N.Y. Aug. 21, 2014).  Moreover, medical consultants Dale and Findlay specifically opined that Rodriguez was capable of standing and walking for six hours a day and stooping occasionally.  (Tr. at 299-300, 426-27.)  Dr. Dale specifically opined that Rodriguez was capable of the demands of light work, except that she had limitations on the overhead use of her upper extremities and respiratory restrictions.  (*Id.* at 427.)  Accordingly, Rodriguez's assertion that the ALJ's determination that

she could perform light work "was nowhere supported by medical evidence in the record," (Dkt. No. 14 at 15), is also untenable.

**E.**    **<u>Credibility Determination</u>**

According to Rodriguez, the ALJ failed to sufficiently set forth his reasons for rejecting her testimony as to her pain and limitations. (Dkt. No. 14 at 14-15.) The Commissioner disagrees and argues that the ALJ appropriately discussed Rodriguez's daily activities, inconsistent statements, and types of medications. (Dkt. No. 18 at 14-15.) The court agrees with the Commissioner that there is no reason to disturb the ALJ's credibility assessment.

Once the ALJ determines that the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce the [symptoms] alleged," he "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (internal quotation marks and citations omitted). In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the

weight given to the [claimant's] statements." SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2, 1996). Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *F.S. v. Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).

Despite Rodriguez's claims to the contrary, it is readily apparent that the ALJ considered all of the record evidence and the appropriate factors in finding her "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . not credible." (Tr. at 41-42.) As the Commissioner points out, (Dkt. No. 18 at 16), the ALJ explained, in detail, his reasons for discounting Rodriguez's testimony, including that she failed to see any treatment providers for a long period of time and only returned to more regular medical treatment after the continuing disability review was commenced in 2011. (Tr. at 41); *see* SSR 96-7p, 61 Fed. Reg. at 34,487 ("[T]he individual's statements may be less credible if the level or frequency

of treatment is inconsistent with the level of complaints.").  The ALJ also considered Rodriguez's daily activities including her ability to care for her young grandson, volunteer at her church, attend church three times a week, take the Medicaid bus, and participate in an orientation program as a prerequisite for GED classes.  (Tr. at 41.)  Additionally, the ALJ found that Rodriguez's complaints with respect to her inability to hold onto objects were not supported by objective clinical findings.  (*Id.*)  Further, the ALJ noted inconsistencies in her testimony and her statements to her treatment providers, the lack of side effects from her medications, and her poor work history.  (*Id.*)

Although the ALJ did not undertake a step-by-step exposition of the factors articulated in 20 C.F.R. § 404.1529(c), "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record." *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted); *see Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (stating that the 20 C.F.R. § 404.1529(c)(3) factors are

included as "'examples of alternative evidence that may be useful [to the credibility inquiry], and not as a rigid, seven-step prerequisite to the ALJ's finding'" (quoting *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 546 (S.D.N.Y. 2004))). Here, the ALJ explicitly acknowledged consideration of the 20 C.F.R. § 404.1529 factors, (Tr. at 40), and it is evident from his thorough discussion that his credibility determination was legally sound.

## F.   **VE Testimony**

Finally, Rodriguez asserts that the ALJ erred in concluding that she could perform the full range of light work, without consulting a VE. (Dkt. No. 14 at 11-12.) According to Rodriguez, because she suffers mental, manipulative, cardiac, and respiratory impairments, which cause nonexertional limitations, the testimony of a VE was required. (*Id.*) The court disagrees.

In making his ultimate disability determination, the ALJ must consider whether the claimant can do any other, less demanding work existing in the national economy. *See* 20 C.F.R. §§ 404.1560(c), 404.1594(f)(8); *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). To make such a determination, an ALJ may rely on the Medical-Vocational Guidelines, referred to as "the grids," found in 20 C.F.R. pt. 404, subpt. P,

app. 2, as long as the claimant's age, education, work experience, and RFC coincide with the criteria of a rule contained in those Guidelines. *See* 20 C.F.R. §§ 404.1569, 404.1594(b)(5); *see also Calabrese v. Astrue*, 358 F. App'x 274, 275 n.1 (2d Cir. 2009). However, "if a claimant's nonexertional impairments 'significantly limit the range of work permitted by h[er] exertional limitations' then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)). In that case, the ALJ should consult with a VE before making a determination as to disability. *See id.*

Here, the ALJ determined that, beginning on May 27, 2011, Rodriguez could perform the full range of unskilled light work. (Tr. at 40, 44.) Based on this RFC, as well as Rodriguez's age, education, and work experience, the ALJ consulted the grids and concluded that, as of that date, Rodriguez was not disabled. (*Id.* at 44.) As noted above, the ALJ's RFC determination, which included the ability to occasionally engage in postural activities and occasionally reach overhead with her upper extremities, as well as the need to avoid concentrated exposure to

respiratory irritants, was supported by substantial evidence.  *See supra*

Part VI.D.  In making his ultimate determination of disability, the ALJ

considered Rodriguez's nonexertional limitations, and concluded that they

had little to no effect on the occupational base of light work, noting that her

ability to work at waist or table level was unimpaired and her ability to

manipulate fine and gross objects was essentially intact.  (Tr. at 44.)  This

conclusion is supported by Social Security Ruling 83-14, which explains

that unskilled light work requires gross use of the hands to grasp, hold, and

turn objects.  *See* 1983 WL 31254, at *4 (1983).  Further, Ruling 85-15

provides that a restriction to only occasional postural movements, such as

stooping, kneeling, crouching, crawling, climbing, and balancing, ordinarily

has a minimal impact on the light occupational base.  *See* 1985 WL 56857,

at *6-7 (1985).  This ruling further advises that, where an individual has a

medical restriction to avoid excessive amounts of dust, the impact on the

broad world of work would be minimal.  *See id.*, at *8.  In addition to these

physical nonexertional restrictions, the ALJ considered  Rodriguez's mental

nonexertional restrictions and concluded that she retained the ability to

perform the full range of unskilled work.  (Tr. at 44.)  Thus, the ALJ

concluded that her mental impairments did not significantly limit the light

occupational base.  *See id.*, at *4.

Ultimately, because the ALJ determined that Rodriguez had the ability to perform light work and that her nonexertional impairments did not significantly impact her abilities in that regard, he was not required to seek testimony from a VE.  *See Kessler v. Colvin*, 48 F. Supp. 3d 578, 599 (S.D.N.Y. 2014) (holding that the ALJ did not err in relying on the grids to determine that the claimant was not disabled, where the ALJ concluded that a limited ability to reach overhead did not significantly impact the claimant's ability to perform light work).

## G.    Remaining Findings and Conclusions

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Rodriguez's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

34

**IT IS SO ORDERED.**

February 4, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge